**NATIONAL ACCEPTANCE COMPANY OF AMERICA, Appellant,**

v.

**Frank S. BLACKFORD, Trustee in Bankruptcy of the Estate of Shelco Building Corporation, Bankrupt, Appellee.**

**No. 26104.**

United States Court of Appeals
Fifth Circuit.
March 3, 1969.

Nolan B. Harmon, Archer D. Smith, III, Atlanta, Ga., George I. Case, Jr., Birmingham, Ala., Harmon & Thackston, Atlanta, Ga., McGowen & McGowen, Birmingham, Ala., for appellant.

Charles L. Denaburg, Robert Loeb, Denaburg & Jones, Silberman, Silberman & Loeb, Birmingham, Ala., for appellee.

Before THORNBERRY and AINSWORTH, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge:

Appellant, National Acceptance Company of America (NACA), claimed the security of a factor's lien in the bankruptcy of Shelco Building Corporation (Bankrupt). NACA's claim in that respect was contested by appellee, Frank S. Blackford, the Trustee. The Referee disallowed NACA's claim on several grounds and the United States District Court for the Northern District of Alabama, upon review, affirmed the Referee's rulings. This appeal followed.

July 21, 1965, NACA entered into a three-year factor's lien agreement with Bankrupt, the purpose of which was to provide NACA with security for sums of money being advanced by it to Bankrupt. Under the agreement, Bankrupt gave NACA the security of a factor's lien *on Bankrupt's materials, goods in process, and finished goods intended for sale* for all loans and advances to be made to Bankrupt "and for all indebtedness and liabilities of every kind of *Borrower* to *Lender,* hereinafter owing: * * *." (Emphasis added.) However, no mention was made of any specific indebtedness to be covered other than a $50,000 loan made simultaneously with the lien agreement.

July 28, 1965, Bankrupt executed a separate five-year lease agreement in Alabama for *rental* of certain machinery and equipment by NACA to Bankrupt. The agreement was completed and accepted by NACA some two months later, in September, 1965, at Chicago, Illinois.

By the terms of the lease, the lessor, NACA, in the event of default, could sell the equipment and then be entitled to recover from the lessee, Bankrupt, the total unpaid rentals less proceeds from the sale. The lease contract made no mention of, or reference to, the earlier factor's lien agreement.

When default occurred, NACA, in accordance with the terms of the *lease* agreement, sold the equipment and ultimately asserted before the Referee a claim for $11,244.12, this sum representing the unpaid rental of $17,244.12, less proceeds of $6,000.00 received from the sale. It further claimed that this balance was secured by the factor's lien.

The Referee found the claim deficient in three respects.

First, he held that NACA's owning and leasing of personal property in Alabama constituted "doing business" within the meaning of Code of Alabama, Title 51, Sec. 339, thus requiring NACA to qualify to do business as required by State law; and since NACA failed to so qualify, Code of Alabama, Title 51, Sec. 342, made the lease agreement unenforceable in Alabama, making the rent claim also unenforceable.

Second, he held that the lease agreement was a security instrument within the meaning of Code of Alabama, Title 47, Sections 110, 123, and 131, and thus had to be recorded. Failure to so record the agreement, he held, was fatal to the rent claim arising out of it.

Finally, he held that the factor's agreement did not contemplate the type of indebtedness here involved; that, accordingly the claim was not secured.

NACA contends that the Referee erred in all these findings. It also argues that the Referee's application of State rather than Federal law in deciding whether the claim was valid, even though NACA did not comply with Alabama law with regard to qualifying to do business, was both erroneous and unconstitutional.

The threshold issue presented to us is whether, even assuming for present purposes that it legally existed, the claim was secured by the factor's lien agreement. If it was not, then NACA could not have enjoyed secured creditor status with respect to the claim involved, making it unnecessary for us to consider the other issues. We hold that the claim was not secured by the factor's lien agreement, and to that extent affirm, without findings as to the Alabama law regarding "doing business."

As previously mentioned, the factor's lien agreement is couched in broad language. It states that "all indebtedness and liabilities *of every kind* of the *Borrower* to *Lender*, hereinafter owing" (emphasis added), are secured by the factor's lien. Moreover, Alabama's statute authorizing such a factor's lien allows security of "all * * * loans and advances to or for the account of the person creating the lien (hereinafter called *the 'borrower'*), together with interest thereon, *and also* for the commissions, *obligations, indebtedness*, charges, and expenses properly chargeable against or due from said *borrower* and for the amounts due or owing upon *any* notes or *other obligations* given to or received by them for or upon account of any such loans or advances, interests, commissions, *obligations, indebtedness*, charges, and expenses, * * *." (Emphasis added.)

NACA argues that this language found in the factor's agreement and in

the quoted statute is sufficiently broad to cover the type of indebtedness here, *i. e.*, a claim for rent following default in the lease agreement, secured not only by the leased property, but generally.

Factoring, such as is involved here, is completely different from traditional common law factoring. That distinction is explained in the following passage from In re Freeman, 294 F.2d 126, 129 (3 Cir. 1961):

"At the common law a factor was an agent employed to sell goods for a principal and receive a commission thereon. The factor had a lien on the goods for any advances made by him and for his commissions. The common law factor's lien was founded on the possession of the goods of his principal and served the function of securing him for the advances owed by the principal. In re Tele-Tone Radio Corp., D.C.D.N.J.1955, 133 F.Supp. 739; 4 Collier, Bankruptcy § 70.77 (14 ed. 1942); Skilton, The Factor's Lien on Merchandise, 1955 Wis.L.Rev. 356, 367.

"The modern factor, however, is a financier who generally lends monies and takes in return an assignment of accounts receivable or some other security. He is not a selling agent. In re Tele-Tone Radio Corp., supra; 4 Collier, op.cit. supra. It is the modern factor who is the primary beneficiary of the factors' lien statutes of the various states. They were enacted to foster his growth and function. Those statutes authorize a floating lien on inventory giving the modern factor a lien without the necessity of taking and maintaining possession of the pledged property. In re Frederick Speier Footwear Corp., D.C.D.Conn.1955, 129 F.Supp. 434; Ogline, The Factor's Lien Act as a Method of Inventory Financing, 4 W.Res.L.Rev. 336, 339 (1953)." [1]

---

1. For a complete history and analysis of modern factoring see 1 Gilmore, Security Interests in Personal Property §§ 5.1–5.6 (1965). A list of all states having factors' lien statutes is found at 4A Collier, Bankruptcy § 70.77 at 859, n. 30e.

Factors' lien statutes commonly authorize security of many kinds of indebtedness.[2] This can be seen in In re Frederick Speier Footwear Corp., 129 F. Supp. 434 (D.C.Conn.1955), the case on which NACA primarily relies. There, one Iselen had purchased accounts receivable of the bankrupt with the understanding that Iselen would bear any loss resulting from the financial inability of the customer of the bankrupt to pay, but that Iselen would not be responsible for any such customers' nonpayment of their accounts resulting from ony other cause, such as defective merchandise. Several years later, the parties entered into an agreement, pursuant to Connecticut's factor's lien statute, which, like Alabama's statute here, authorized security of all "obligations and indebtedness" due from the *borrower* to the *lender*. Credit was extended to the bankrupt, the security being a factor's lien on the bankrupt's materials, work in process, and merchandise. The agreement also provided security for "all obligations and indebtedness" owed from time to time to Iselen, by the bankrupt, however arising, including all obligations and indebtedness of the bankrupt to Iselen *which arose under the provisions of the previous contract relative to Iselen's purchase of accounts receivable.*

Thereafter substantial indebtedness arose between the parties due to Iselen's charge-back to the bankrupt of accounts receivable previously purchased by it which had proven uncollectible because the merchandise sold by the bankrupt had been rejected by buyers due to defective manufacture and similar reasons.

In later bankruptcy proceedings, the Referee ruled that, under the factor's lien agreement, Iselen was a secured creditor for the charge-back indebtedness. The District Court affirmed the Referee's decision. However, rather than rest its holding only upon the broad "obligations" and "indebtedness" language, the Court made it clear that the following were crucially important: (1) the indebtedness in question was *specifically included* in the factor's lien agreement, and (2) the indebtedness arose from transactions that were related to the general course of the borrower's business.[3]

Neither of those elements were present here. There was no mention of any rent obligation in the factor's agreement; nor was there anything in the lease concerning security except as to ownership of the leased equipment. The lease agreement was nothing more nor less than just that.[4]

Nor does it appear that the rent obligation arising out of the lease was in any other way connected with the factor's lien agreement. To the contrary, the

2. See Skilton, The Factor's Lien on Merchandise, 1955 Wis.L.Rev. 631–634.

3. " * * * Where, as in this case, the agreement between the borrower and the factor includes within the security of the lien, the contingent liability of any charge-backs arising out of the accounts receivable contract, such inclusion is permitted and is enforceable under [the factor's lien statute].

  *   *   *   *   *

" * * * The petitioner objects that this opens the door to using the factor's lien to secure all sorts of debts such as breaches of warranty, torts and personal expenditures of the borrower, unrelated to his business. *Whether the statute could be construed to be so all encompassing, it is not necessary here to decide.* It is construed, however, to permit lien security for debts and obligations

arising from transactions which are related to the general course of the borrower's business *and which are included in the agreement between the factor and the borrower.* * * * * " (Emphasis added.)

4. At page 12 of its original appellate brief, NACA recognized this to be true, saying:

 "An examination of the lease in question (R. 68) will show that it is designated as a lease. It had to be recognized as one in order for the Court to have surrendered the property to NACA in the first place. There was no security deposit in connection with this lease. Most importantly, it did not contain an option to purchase. NACA retained ownership at all times.

 "The instrument therefore was truly a lease * * *."

duration of the respective agreements—three years as concerned the factor's lien and five years as to the lease—plainly shows that the parties did not relate the two together in their minds. Moreover, the factor's agreement was couched in terms of "Lender" and "Borrower," whereas the lease was a pure lessor-lessee contract. Consequently, with respect to the factor's lien, appellant was a "Lender" and Bankrupt was a "Borrower," whereas in the lease contract NACA was a "lessor" and Bankrupt was a "Lessee."

With this total absence of nexus between the lease indebtedness and the factor's lien agreement, we hold that the broad language of the factor's lien agreement was an insufficient basis upon which to conclude that such lease indebtedness was secured by it.

Holding as we do, that NACA was not a secured creditor, it is unnecessary to consider the other questions it has raised.

Affirmed.